Filed 2/26/25  P. v. Taylor CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KIRELL FRANCIS TAYLOR,<br><br>Defendant and Appellant. | B335425<br><br>(Los Angeles County<br>Super. Ct. No. LA033959) |

APPEAL from an order of the Superior Court of Los Angeles County, Eric P. Harmon, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Kirell Taylor appeals from the denial of his Penal Code section 1172.6[1] resentencing petition after an evidentiary hearing. He contends that substantial evidence does not support the trial court's findings that he was a major participant in the underlying felonies and acted with reckless indifference to human life. He also contends that the court erred by failing to consider that he was 23 years old at the time of the crimes. We reject these contentions and affirm the order.

## FACTUAL BACKGROUND

The following facts are taken from the reporter's and clerk's transcripts of Taylor's jury trial, which the parties submitted below and of which we have taken judicial notice.[2]

### I. Prosecution Case

#### A. Events at the Rawlings Home

Around 7:20 or 7:30 p.m. on February 8, 1999, Christopher Rawlings left his Woodland Hills home in his white Bentley to pick up groceries and dinner. Rawlings had his wallet with him, and generally carried large amounts of cash—$1,000 to $5,000— in his pockets. Rawlings's wife, Barbie Rawlings, stayed home with the couple's two young children. Rawlings called Barbie[3] about 45 minutes after he left to tell her he was on his way to pick up dinner and would be home soon.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The parties also asked the trial court to consider, and we have taken judicial notice of, the appellate opinion resolving Taylor's direct appeal, (*People v. Taylor* (Aug. 29, 2002, No. B153903) [nonpub. opn.] (*Taylor I*)).

[3] We refer to Barbie by her first name to avoid confusion. No disrespect is intended.

2

Around five or 10 minutes later, Barbie heard the garage door open and loud music coming from Rawlings's car.  The music stopped as Barbie walked toward the garage, intending to help Rawlings with the groceries and takeout.  Barbie heard loud voices, which she described as "deep," "commanding," and "forceful"; one of them said, "Get down."  Barbie opened the door separating the house from the garage and saw Rawlings kneeling on the floor, with two men standing over him, pushing or punching him.  The men were dressed in "all black," and their faces were obscured by black ski masks.

The men did not look at Barbie, who stood and watched in disbelief for about 10 to 15 seconds.  After she heard Rawlings say "oh my god, this is happening" or "oh, my god, why is this happening" in a "crying voice," Barbie ran back into the house.  She grabbed the cordless phone from the kitchen, called 911, and reported that "bad people" were in her house "robbing us and they have my husband."  While she was on the phone, Barbie ran upstairs, grabbed her children, and took them out a third-floor window onto the roof of the house.  From the roof, Barbie "heard noises in the garage like lots of movements, things going on" and heard Rawlings scream.

Los Angeles Police Department (LAPD) officer David Abdalian testified that he and his partner, officer Rich Andert, were driving in their patrol car around 9:00 p.m. when they were dispatched to a burglary in progress at the Rawlings home.  As they approached the house, Abdalian saw Barbie and the children on the roof and heard "loud voices, short sentences, almost command-type statements" coming from the closed garage.  Andert radioed for backup.

Approximately one to two minutes after Andert called for backup—about 10 to 15 minutes after Barbie fled to the roof—the garage door opened. The Bentley backed out of the driveway, struck the curb on the opposite side of the street, then drove away; Barbie and Abdalian gave conflicting testimony about whether it was moving slowly (Barbie) or quickly (Abdalian). A police car arrived and began following the Bentley.

Abdalian and Andert entered the house through the open garage door. They "searched for victims, suspects," but did not find anyone in the house. The officers helped Barbie and the children climb back inside through the window. Barbie testified that she was "terrified and I was crying because the guys had taken my husband and I was just scared to be inside the house, I didn't know if there were still people inside."

As Barbie and the officers walked through the house, they saw that all the bedroom doors were open and there was jewelry scattered on the floor of the master bedroom. Several pieces of Rawlings's and Barbie's jewelry were missing, including Barbie's Cartier bracelet, ring, and earring set adorned with panthers. Barbie's purse was upended, and her wallet and credit cards were missing. Barbie and the officers found a "relatively new" roll of duct tape on a walkway outside the garage; it had not previously been there or inside the garage or house.

### B. Pursuit and Crash

Meanwhile, LAPD officers Kerry Suprenant and Mike Callan joined the pursuit of the Bentley in a marked police cruiser. Suprenant saw that a Black man was driving, but could not tell if there were passengers in the vehicle. Suprenant estimated the Bentley was going close to 100 miles per hour. It crossed into oncoming traffic, then "made an erratic movement"

4

back across three lanes and struck a small blue car.  The Bentley spun and "it hit a curb, it hit a wooden power pole, from there it continued to spin, and went into a front yard of a residence where it also struck a tree."  The power pole "sheered [*sic*] off towards the bottom and fell into the street," along with the power lines it carried.  The power lines sparked, and there was a loud explosion.  The Bentley came to rest against the tree.

Suprenant stopped his cruiser in the middle of the street and shined a spotlight on the Bentley, but did not see anyone exit the car.  When other officers arrived a few minutes later, Suprenant approached the Bentley with them.  He did not see any people in the passenger compartment or open trunk of the car.  Suprenant and the other officers noticed a "debris field or pattern" that "fanned out" from the trunk toward a nearby brick wall.  Suprenant followed the debris pattern and found an unconscious man—Rawlings—lying face down, with serious injuries to his head and face.  Suprenant and his partner radioed for an ambulance.

Rawlings was taken to the hospital, where he ultimately died.  The deputy medical examiner who performed an autopsy on Rawlings testified that he suffered "injuries to the head, torso, and extremities.  Specifically there were lacerations, contusions and abrasions of the head, skull fractures, and brain injuries" including "contusions or bruises of the brain and secondary changes of the brain consequent to injury."  Rawlings's skull "was fractured in a complex manner" around the forehead, top of the head, and the eye socket area.  The medical examiner opined that the head injuries were fatal; the "mechanism of death was impact injuries to the head which caused fracturing and caused brain injury which led to brain death."  The medical examiner further

opined that these injuries were "consistent with someone being thrown out of a vehicle at a high speed and hitting his head on a cinder block wall." None of Rawlings's injuries "had an unequivocal appearance of occurring before the accident."

### C.    Perpetrators' Flight

Dani Yashouafar witnessed the crash. He testified that after the Bentley came to rest against the tree, he saw a Black man get out of the driver's side door and "go across the street." A "couple minutes later," he saw another Black man exit the car through the driver's side door, "limping a little." Yashouafar was not sure if the men were wearing ski masks. He estimated that both men were about 20 to 26 years old. The two men fled in opposite directions.

David Mack was at his neighbor's house on February 8, 1999 when he heard a loud bang and the electricity went out. Mack went outside and saw a Black man with a "very youthful appearance" wearing a "darker color" "sweat outfit" running through the gated cul-de-sac. Mack asked the man, "what's going on?," and the man replied, "A bunch of shit is happening over there" as he continued running. Mack "heard a bang as the man "hit the doorway to the backyard of another neighbor's house." In late July 1999, nearly six months after the incident, police asked Mack if anyone in a six-pack photo array resembled the man. Mack selected a photograph based on the person's "youthful appearance," but wrote that he was "not positive that he is the person who committed the crime." Mack identified Taylor in court as the person whose photograph he circled.

Connie London testified that on the night of February 8, 1999, she and her husband were watching television when she heard an explosion and the power went out. London then heard

6

"a crash on the right side of our house, sounded like something crashed through our gate." London's husband opened the blinds and "immediately said, 'oh, my god, there's somebody in our backyard.'" London saw a person she identified in court as Taylor walk past the window "very slowly, very cautiously," as though he was "trying to stay out of the lights of the helicopters that were above." The person was wearing dark pants and a navy blue hooded sweatshirt. London selected Taylor's photo from a six-pack photo array police showed her in July 1999.

John Sorrentino testified that on the night of February 8, 1999, he was in his kitchen when he saw a big flash outside, heard a big explosion, and the power went out. Sorrentino went outside and saw a "young, . . . late twenties, early thirties" Black man "kind of jogging, . . . moving at a fast pace" down the street. The "very suspicious" man, who eventually "jumped over somebody's fence," was wearing dark pants and a light-colored football jersey or "something like that or had an inscription on it." The following day, neighborhood resident Jerry Mather found a black sweatshirt and gloves on the ground near his van, which was parked on Sorrentino's street, and called the police. LAPD detective David Szabo, who responded to Mather's call, testified that the sweatshirt had duct tape on the front and back. In July 1999, Sorrentino selected two photographs that resembled the man he saw on February 8 from a six-pack photo array; one of them was Taylor.

Amit Danon and Oren Afriat testified that on February 8, 1999, they were at a friend's house when they heard a big explosion, "saw a big light in the sky and all the power went out." Danon and Afriat got into Afriat's car to go see what had happened. Before Afriat started the car, a Black man who

7

"looked very tired," scared, and sweaty ran up to the car, put his hands on the hood, and offered Danon and Afriat "a thousand dollars to get him out of that area." They declined the offer and drove away. A few days later, Danon and Afriat described the man to a police artist. In July 1999, Danon circled two pictures in a six-pack photo array that resembled the man; one of them was a photo of Taylor. Afriat circled only the photo of Taylor.

Maria Vasquez testified that on the night of February 8, 1999, she was driving home from school. As she was making a left turn, a man "jumped out in front of" her car and "pounded on [her] vehicle." The man opened her unlocked driver's side door and shouted at her. Vasquez was frightened and did not understand what the man was saying. The man reached into the car and shifted it into neutral. He then struck Vasquez in the face and head, grabbed her by the hair, pulled her out of the car, and threw her onto the street. The man got into the running car and drove away, taking with him Vasquez's belongings that were in the car. Vasquez identified the man in court as Taylor. She also selected Taylor's photograph from a six-pack array in July 1999.

### D. Investigation and Apprehension of Taylor

LAPD detective Andrew Purdy, the lead investigator on the case, assigned LAPD detective Steven Galeria to investigate the scene of the Bentley crash. Galeria found two ski masks: one in the driver's seat and one on the ground next to the Bentley. He also found a glove and a police scanner near the car, and handcuffs in the area where Rawlings was found. After the car was towed to the police garage, Purdy found a loaded revolver on the front passenger floorboard and a garage door opener in the

trunk.  The garage door opener had blood on it that was later determined to be Rawlings's.

The day after the crash, Donna Collins was driving around the area when she noticed a green Mustang with a tan roof parked in a traffic lane.  A Black man was standing on the sidewalk near the car, searching through some bushes.  Collins thought the man's behavior was "strange" and called the police.  Officers searched the bushes that evening and found Rawlings's wallet.

Several days later, Purdy asked Vasquez, Danon, and Afriat to meet with a sketch artist to generate a composite sketch of the suspect they had seen.  The artist prepared a sketch on February 19, 1999.  When shown the sketch during cross-examination, Taylor testified, "That looks exactly like me."[4]

On May 19, 1999, Purdy received an anonymous tip on his answering machine. Purdy testified that the tip was something to the effect of, "You've got to go to this address on Vaughn Street and check out Kirell. . . .   He's the one that killed that poor man in the Bentley."  Purdy advised other officers about the tip, and they "would drive by the location and they'd document license plates or cars that were parked in and around the residence."  One of the cars belonged to someone on parole, which prompted officers to run the address for other parolees.  They discovered that a parolee named Kirell Taylor lived at the Vaughn Street residence.  Purdy also saw "a tan over green Mustang almost exactly like what Donna Lou Collins had described parked in

---

[4]     Taylor further testified that the sketch was actually drawn in July 1999 after he was arrested and taken into custody, and was backdated as part of the LAPD's efforts to frame him for the crimes.

front of that address," and learned it was registered to Taylor's "girlfriend/common law wife."

Purdy "went to parole and got all the information on Mr. Taylor." After learning that Taylor was a suspect in a Hawthorne robbery in which the perpetrators wore ski masks, Purdy contacted Taylor's parole agent. The parole agent arranged a meeting with Taylor.

On July 13, 1999, Purdy, LAPD detective Terrill West, and two detectives from the Hawthorne Police Department went to the parole office to meet Taylor. West testified that Taylor "took an aggressive stance," when officers attempted to handcuff him, and Purdy testified that Taylor said, "I'm not going to the Van Nuys court and be falsely accused of something that I didn't do." After Taylor "attempted to make a move for the window," one of the detectives from Hawthorne, detective Mena, told him that she wanted to talk to him about the Hawthorne robbery. Taylor relaxed and allowed the officers to handcuff him; he denied involvement in the Hawthorne robbery.

Mena and her partner drove Taylor to the Van Nuys infirmary to obtain a blood sample, which Taylor consented to provide. The nurse who drew the blood sample testified that she did not take a saliva sample from Taylor and did not see West obtain one. Purdy testified repeatedly that the police did not take a saliva sample from Taylor or ask him to spit into a vial. After Taylor provided the blood sample, the Hawthorne police took him into custody. DNA from Taylor's blood sample was later compared to DNA retrieved from around the mouth hole of one of the ski masks found in the Bentley. The two samples matched "to a reasonable degree of scientific certainty."

Police obtained and executed a search warrant for the Vaughn Street residence. In Taylor's bedroom, they found Barbie's panther bracelet and one of the matching earrings. They also found a business card belonging to Rodney Leonard, who co-owned a clothing store with Rawlings. Leonard testified that he recalled seeing Taylor in the store "maybe twice" prior to February 1999 and giving him the card. Leonard also testified that Rawlings visited the store almost every day wearing expensive jewelry and parked his Bentley out front.

## II.    Defense Case

Taylor, who represented himself, presented an alibi defense and argued that the police had framed him. Taylor's sole alibi witness, Sabrina Roots, testified that she followed Taylor home on the evening of February 8, 1999, because her "car was acting up," he was riding his motorcycle, and it was raining. Roots and Taylor left Taylor's Hollywood recording studio around 8:00 p.m. and arrived at Taylor's house on Vaughn Street in Pacoima around 8:45 p.m. Roots immediately turned around and drove her car home.

Taylor testified that the police had framed him. He initially stated that the police planted Leonard's business card in his room, but later admitted visiting the clothing store, asking Leonard about a suit, and receiving Leonard's card. Taylor also testified that on the day of his arrest, detective West asked him to spit into a tube. After his DNA expert testified that the DNA sample from the mask was a "rare" profile that likely came from Taylor, Taylor argued during closing that the police planted the saliva from the tube onto the ski mask recovered from the Bentley. Taylor denied that Barbie's jewelry was recovered from

11

his room; he testified that he would have had his girlfriend or grandmother remove it if it had been there.

Taylor called several witnesses who had seen the perpetrators on the night of February 8, 1999 but were unable to identify them. Barbie testified that she "remembered seeing white" through the eyeholes of the ski masks and was unsure of the perpetrators' races. Connie London's husband, Alan London, testified that the man he had seen in his yard appeared to be a light-skinned Black man or dark-skinned Hispanic man. When he called 911, he described the man as Hispanic. Arloa Pierce and John Long both testified that the person they saw was wearing a light-colored shirt. Pierce could not determine the man's race, and Long thought he was Hispanic.

## III. Charges and Conviction

A nine-count amended information filed March 1, 2000 charged Taylor with (1) the murder of Rawlings (§ 187, subd. (a)); (2) kidnapping Rawlings to commit robbery (§ 209, subd. (b)); (3) kidnapping Rawlings during the commission of a carjacking (§ 209.5, subd. (a)); (4) first degree residential robbery of Rawlings (§§ 211, 212.5, subd. (a)); (5) first degree residential burglary of Rawlings (§ 459); (6) carjacking Rawlings (§ 215, subd. (a)); (7) evading an officer causing the death of Rawlings (Veh. Code, § 2800.3); (8) carjacking Vasquez (§ 215, subd. (a)); and (9) second degree robbery of Vasquez (§§ 211, 212.5, subd. (c)). The information further alleged—in separate allegations—that the murder was committed while Taylor was engaged in the commission of burglary, robbery, carjacking, and kidnapping (§ 190.2, subd. (a)(17)), and that Taylor personally inflicted great bodily injury on Rawlings during the commission of the burglary, robbery, carjacking, and kidnapping (§ 12022.7, subd. (a)).

12

Additionally, the information alleged that Taylor previously suffered a conviction for a serious or violent felony (§§ 667, subd. (b)-(i), 1170.12, subds. (a)-(d)) and did not remain free of custody for five years (former § 667.5, subd. (b)).

Taylor proceeded to a jury trial, at which he represented himself. The jury rejected Taylor's alibi defense and claims he had been framed and found him guilty on all counts. It also found true all the special circumstance and enhancement allegations.[5] The trial court sentenced Taylor to life without the possibility of parole, plus 24 years and four months. On direct appeal, a different panel of this court modified Taylor's sentence by staying under section 654 the term of one year, four months that had been imposed for evading an officer. It otherwise affirmed the judgment. (See *Taylor I*, *supra*.)

## IV. Section 1172.6 Proceedings

### A. Summary Denial and Remand

Taylor filed a verified petition for resentencing under former section 1170.95 (now section 1172.6)[6] in January 2020. After appointing counsel and receiving briefing, the trial court

---

[5] The jury was not provided with verdict forms regarding the prior conviction allegations. Prior to sentencing, Taylor brought the error to the trial court's attention and moved for new trial. The court denied the motion and found the allegations true. On direct appeal, a different panel of this court concluded that the trial court erred by making findings regarding the prior convictions, but concluded the error was harmless because "the record leaves no question that appellant was convicted in 1993 of second degree robbery with personal use of a gun." (*People v. Taylor* (Aug. 29, 2002, No. B153903) [nonpub. opn.] (*Taylor I*).)

[6] Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute.

13

denied the petition at the prima facie stage, holding that the jury's special circumstances findings rendered Taylor ineligible for relief as a matter of law. A different panel of this court reversed the ruling in 2022 and remanded with directions for the trial court to issue an order to show cause and hold an evidentiary hearing. (*People v. Taylor* (Apr. 21, 2022, No. B312057) [nonpub. opn.] (*Taylor II*).)

## B. Additional Briefing

On December 27, 2022, the trial court issued an order to show cause pursuant to section 1172.6, subdivision (c). Taylor, representing himself, filed a brief arguing that the prosecution could not prove that he kidnapped or intended to kill Rawlings. He also contended that prosecution could not prove he was the actual killer because it was unclear if he was driving the car, and could not prove he was a direct aider and abettor because Rawlings could have gotten in the trunk of his own volition. Taylor additionally argued that there was insufficient evidence he was a major participant in the crimes or acted with reckless indifference to human life as those requirements are defined by *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). To this end, Taylor asserted that he "was not involved in any planning of the carjacking, kidnapping, or murder" of Rawlings; there was no evidence he "had a prior criminal relationship with" or even "knew the driver of the Rawlings vehicle"; he had no knowledge of any weapons used or Rawlings's presence in the trunk; and as the (alleged) passenger he could not stop the car or otherwise prevent the kidnapping or crash. He made no mention of his age at the time of the incident.

14

The prosecution filed an opposition brief arguing that evidence adduced at Taylor's trial "shows that his conviction for murder continues to be valid because he was a major participant and acted with reckless indifference to human life." The prosecution requested that the trial court take judicial notice of the 12-volume reporter's transcript and three-volume clerk's transcript from Taylor's trial, as well as *Taylor I, supra*. Citing evidence from the reporter's transcript, the prosecution argued that Taylor was a major participant under *Banks* and acted with reckless indifference to human life under *Clark*.

### C.  Evidentiary Hearing

The trial court held an evidentiary hearing on July 24, 2023.  At the hearing, the prosecution provided the court with electronic copies of the materials of which it had requested judicial notice.  Both sides agreed to submit on those materials; neither side introduced new or additional evidence.  The court stated it would review the materials and invited the parties to argue.

After reading a portion of his brief into the record, Taylor told the court that he "desires to re-litigate and reexamine the kidnapping to commit robbery at count 2, and the kidnapping to commit carjacking at count 3, because count 2 and count 3 directly relate to whether the defendant was not a major participant and/or did not act with reckless disregard to human life pursuant to *Banks* and *Clark*." Taylor maintained his alibi defense, but asserted that "hypothetically, if the defendant were present at that crime, he definitely would have prevented a kidnapping, because you don't go to a robbery to commit a kidnapping, you don't go to a kidnapping and go commit a murder.  That's what stupid criminals do. . . .  [T]he prosecution

15

has never, to this point, proven beyond a reasonable doubt that the defendant had a specific intent to commit kidnapping, carjack and commit kidnap for robbery."

Taylor further asserted that the prosecution's opposition to his petition was "speculative" to the extent it asserted that he knew of Rawlings's presence in the trunk or played any role in putting Rawlings there. Taylor hypothesized a scenario in which the driver of the car "placed the victim in the trunk unbeknownst to the passenger, as he was inside of the house rummaging through the victim's property; and in that scenario, came outside into the garage and got into an argument with his confederate and jumped in the passenger seat as his confederate was backing out of the garage. . . . [T]o state that petitioner was physically present and actively involved in the kidnapping, that's just not true, and they have no evidence beyond a reasonable doubt that that is true." Taylor argued that under this scenario, in which he was the passenger, there was no evidence that he was or assisted the actual killer. Taylor also argued that the LAPD manipulated evidence and framed him.

The prosecution responded that "this hearing is not an opportunity for [Taylor] to plead his innocence." The prosecution pointed to Barbie's testimony that she heard Rawlings scream from her perch on the roof before the garage door opened, and asserted that the scream "would have been heard by both defendants" such that "there is no way for either of them to argue . . . that they were not aware that Mr. Rawlings was in the trunk." The prosecution also argued that even if Taylor were the passenger during the police pursuit, he aided and abetted the driver because "his presence in the garage prevents Mr. Rawlings from fighting back; it helps them getting him into the trunk,

16

assists with overpowering him.  The idea that he crawled in the trunk is silly. . . .  Fleeing in the car, that's something that both of these guys are participating in. Mr. Taylor is there giving support, he's there giving assistance to the driver.  He is absolutely aiding and abetting the kidnapping, just the way that the jury found.  And in so doing, he's acting in a way that carries a high probability of death."

In reply, Taylor reiterated his contention that "you can't assume where the passenger was at any particular point" during the 10 to 15 minutes the perpetrators were in the Rawlings home and garage.  He further asserted that the passenger in the car "had no opportunity to stop the driver," slow down the car, or otherwise prevent the crash.  Neither Taylor nor the prosecution mentioned Taylor's age at any point.

### D. Ruling

On October 13, 2023, the trial court issued a written order denying the petition.  The court stated that it "reviewed the entire record of conviction in the matter, including the entire twelve-volume set of trial transcripts, and the trial exhibits," in addition to the parties' written and oral arguments.  It further stated that it was "relying on facts taken from the evidence before it and not from prior appellate opinions."

The court made the following factual findings.  Taylor and an accomplice pursued Rawlings into his garage, detained him, and forced him to the ground.  Barbie called 911 and ran to the roof after seeing the two men and hearing their commands.  Police arrived "[a]s Taylor and the accomplice ransacked the residence for valuable items."  "Alerted to the police presence by way of a scanner they had brought along, Taylor and his accomplice forced Rawlings into the trunk of his Bentley sedan,

17

and fled the scene." After a high-speed pursuit that came to "a horrific conclusion," Rawlings "was ejected from the trunk." The perpetrators "abandoned the vehicle, leaving Rawlings unconscious at the accident scene." Rawlings later died from his injuries. The court rejected Taylor's alibi as "belied by the DNA evidence linking him to the crimes and the stolen property recovered from his room."

The court considered the *Banks* factors and concluded there was "proof beyond a reasonable doubt that petitioner was a major participant in the underlying crimes leading to the death of the victim." The court first found that Taylor was part of a "sophisticated and well-thought-out plan" and "engaged in significant planning of the criminal enterprise" that ended in Rawlings's death. The court cited evidence showing Taylor visited Rawlings's clothing store multiple times and had its business card in his room; a loaded revolver, a police scanner, handcuffs, a ski mask with Taylor's DNA on it, and a garage door opener with Rawlings's blood on it were found at the crash scene; and duct tape was found near the Rawlings home. In considering Taylor's awareness of the particular dangers of the crime, the court pointed to much of the same evidence to find that Taylor and his co-perpetrator "had a plan that a gun would be used, at the very minimum, to force the victim (or victims) to submit to being handcuffed or duct taped."

The court next considered Taylor's presence at the scene of the killing, ability to facilitate or prevent Rawlings's death, and the contributions his actions or inaction made. Here, the court found that both perpetrators stood over and pushed Rawlings while he was in the garage, Barbie heard noises and movement and her husband's scream, "Taylor and the other perpetrator

18

forced the victim into the trunk" after becoming aware of police presence via the police scanner, and two men left the car and fled the scene after the chase and crash. The court concluded "Taylor was present at stages [*sic*] of the criminal enterprises, including at the scene of the killing," and "did nothing to interrupt the chain of events" or "abandon his criminal enterprise." Finally, the court considered Taylor's actions after the lethal force was used. It found that instead of rendering aid to the unconscious and injured Rawlings, Taylor "instead fled and carjacked another victim." Viewing these findings together, the court concluded Taylor was "a major participant in the criminal enterprise that resulted in Rawlings's death."

The court then considered the *Clark* factors, which it noted have significant overlap with the *Banks* factors, and found, "beyond a reasonable doubt, that petitioner acted with reckless indifference in the underlying criminal enterprise." The court reiterated its previous findings with respect to Taylor's presence during the crimes and failure to withdraw from or stop them. The court further found that the crimes lasted at least 10 to 15 minutes in addition to the perpetrators' flight, and "Taylor did nothing to minimize the risk of violence, and instead escalated the risk of violence by putting Rawlings in the trunk." With respect to the number and use of weapons, and Taylor's knowledge thereof, it found that the loaded revolver recovered from the car showed that "at least one of the perpetrators was armed with a firearm," and "without the use of a gun, the perpetrators would have almost no chance of ensuring that the victim would comply to the degree he did." The court found that it was "not clear what Taylor's knowledge" of his confederate's likelihood of killing was, but it was clear that he "escalated the

19

risk of violence" and there was "no evidence" that he attempted to minimize the risk of violence.

The court observed that "Taylor could have done any number of things to help the victim" when the police arrived at the Rawlings home, including "demand that they leave without him, distract the other person, or attempt to dissuade him, to name a few. But instead, petitioner chose to continue to force the victim to comply with their demands and, along with the other perpetrator, forced him into the trunk. He had an opportunity to let Rawlings stay behind at his home instead of forcing him into the trunk." The court continued, "A law-abiding person in Taylor's position would have perceived that placing the victim in the trunk of a car that was about to flee the police posed a grave danger to his life, and Taylor knowingly and actively participated in the kidnapping in disregard of that risk. Furthermore, as evidenced by their use of a police scanner, Taylor was focused on avoiding apprehension, which is why he decided to take Rawlings with them. At no time prior to the fatal crash did Taylor try to deescalate the situation, and after the crash he demonstrated his ongoing indifference to human life by carjacking another victim." In light of these findings, the court denied the petition.

Taylor timely appealed.

## DISCUSSION

### I.      Section 1172.6

Effective January 1, 2019, the Legislature "'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human

20

life.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*), quoting Stats. 2018, ch. 1015, § 1(f).) As amended, section 188, subdivision (a)(3) now provides that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189 now provides that a participant in qualifying felonies during which a death occurs generally will not be liable for murder unless (1) he or she was "the actual killer," (2) he or she, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or (3) he or she "was a major participant in the underlying felony [who] acted with reckless indifference to human life." (§ 189, subds. (e)(1)-(3); accord, *People v. Wilson* (2023) 14 Cal.5th 839, 868-869.)

A person convicted of murder or attempted murder under a now-invalid theory may petition the trial court under section 1172.6 to vacate the conviction and be resentenced on any remaining counts. (§ 1172.6, subd. (a).) If the trial court determines the petitioner has made a prima facie showing of eligibility for relief, the court must issue an order to show cause and hold an evidentiary hearing at which the prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under current law. (§ 1172.6, subds. (c), (d)(3)). At the evidentiary hearing, the trial court "act[s] as an independent fact[ ]finder" and may consider evidence admitted at any prior hearing or trial that is admissible under current law, or any new or additional evidence submitted by the parties. (§ 1172.6, subd. (d)(3).) The trial court "must review all the relevant evidence, evaluate and

21

resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard. . . .” (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) “‘If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.’” (*People v. Wilson*, *supra*, 14 Cal.5th at p. 869, quoting § 1172.6, subd. (d)(3).)

## II.   Standard of Review

We review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*Clements, supra*, 75 Cal.App.5th at p. 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 (*Mitchell*).)  Under this standard, we “““examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.”’” (*Clements*, at p. 298.)  Substantial evidence includes both circumstantial evidence and reasonable inferences drawn therefrom (*People v. Brooks* (2017) 3 Cal.5th 1, 57), and we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence.  (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)  We do not resolve credibility issues or evidentiary conflicts, and we reverse only if there is “no hypothesis whatever” under which the findings are unsupported by substantial evidence.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

## III. Major Participant

Taylor contends the evidence was insufficient to prove he was a major participant in the underlying felonies. He primarily focuses on the kidnapping, "which was what made the robbery and carjacking 'more' than the danger present in every robbery and carjacking." The cornerstone of his argument is that the trial court's finding he was involved in getting Rawlings into the trunk of the Bentley "rests on speculation." In Taylor's view, "it is not reasonable to infer appellant was present when Rawlings was placed in the trunk." Instead, "the only reasonable inference was that one perpetrator was most likely in the garage restraining Rawlings while the other perpetrator was burglarizing the home." Taylor acknowledges that "the evidence does not indicate which role each perpetrator took," but asserts it is "just as reasonable to conclude appellant was the one to ransack the house as his accomplice." Taylor further asserts there was no evidence that the kidnapping was part of the perpetrators' original plan, and no indication of when Rawlings was placed in the trunk.

We reject these arguments to the extent they challenge the validity of Taylor's underlying kidnapping convictions and the jury's findings related to those convictions. Despite Taylor's express desire to "re-litigate and reexamine" the kidnapping convictions, a section 1172.6 petition "does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) The purpose of section 1172.6 "'is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual

23

disputes that have already been resolved.'" (*Ibid.*; see also *Curiel*, *supra*, 15 Cal.5th at p. 460 ["issue preclusion will 'ordinarily' apply in such proceedings"].)  By finding Taylor guilty of kidnapping Rawlings to commit robbery and kidnapping Rawlings during the commission of a carjacking, and finding that he committed the murder during the course of the kidnapping, the jury necessarily found that Taylor was aware of and involved in the kidnapping offenses.  We do not revisit those findings now.

Next, while acknowledging that he "was a participant" in "a robbery, burglary, carjacking and kidnapping that did not involve a plan to kill," Taylor contends that "the evidence showed he was not a major participant" in the crimes within the meaning of *Banks*, *supra*, 61 Cal.4th 788.  We disagree.

In *Banks*, *supra*, 61 Cal.4th at p. 794, the California Supreme Court set forth several factors relevant to determining "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant" in a felony resulting in death.  Those factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient.  All may be weighed in determining the ultimate question, whether the defendant's

24

participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' [Citation.]" (*Ibid.*)

As to the first factor, his role in planning the criminal enterprise, Taylor acknowledges "there was evidence that appellant had a role in planning the robbery and the burglary." He contends "there was no evidence that he had a role in planning the kidnapping," which "was an essential part of the sequence of criminal activity that culminated in Rawlings [*sic*] death." Even if we were to accept Taylor's claim of ignorance as to the kidnapping, which we do not, the robbery and burglary were also essential components of the fatal sequence of events. Those offenses remained ongoing at the time of the crash because the perpetrators had not reached a place of safety. (See *People v. Estes* (1983) 147 Cal.App.3d 23, 28 ["robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety"]; *People v. Bodely* (1995) 32 Cal.App.4th 311, 314 ["felony-murder liability continues during the escape of a burglar from the scene of the burglary until the burglar reaches a place of temporary safety"].) And as Taylor recognizes, substantial evidence supports the trial court's finding that he was involved in planning these crimes. Taylor visited the clothing store Rawlings co-owned at least twice and kept its business card in his room. Taylor's DNA was found on one of the ski masks recovered from the Bentley, which the perpetrators wore to conceal their identities during the crimes. A sweatshirt that a factfinder reasonably could infer Taylor shed during the course of his flight from the crash scene had duct tape on it similar to that found outside the Rawlings home. The perpetrators also came prepared with a police scanner, handcuffs,

and a revolver.  As the trial court found, the attack on Rawlings was "well-thought-out."

As to the second factor, his role in supplying or using lethal weapons, Taylor asserts there was no evidence that he had knowledge of or used the gun recovered from the Bentley, which he speculates could have belonged to Rawlings.  However, an appellant cannot show the "evidence is insufficient by citing only his own evidence, or by arguing about what evidence is not in the record, or by portraying the evidence that is in the record in the light most favorable to himself."  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  Assuming, as Taylor does, that he was the passenger in Bentley, it is reasonable to infer that he was aware of or used the gun found in that area of the car.  Moreover, although neither the trial court nor the parties appear to have considered the point, "[s]everal cases have recognized a vehicle as a deadly weapon based on the manner it was used."  (*People v. Perez* (2018) 4 Cal.5th 1055, 1065.)  Whether passenger or driver, Taylor unquestionably had a role in obtaining the Bentley—the jury found him guilty of carjacking Rawlings—and using it to complete the offenses of robbery, burglary, and kidnapping.

Taylor contends the third *Banks* factor, the defendant's awareness of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participant, cuts in his favor because there was no evidence of a plan to kidnap or kill Rawlings or previous violent behavior by his co-perpetrator.  Whatever Taylor may or may not have believed about the plan for the robbery and burglary at the outset, or knew about his co-perpetrator, he was was clearly aware of the risk of death once Rawlings was placed in the trunk of the Bentley.  (See *In re Harper* (2022) 76 Cal.App.5th 450, 461

*(Harper).)* Further, as the trial court found, the various means of restraint present posed an increased danger to Rawlings, and it was reasonable to infer that at least one of the perpetrators had a gun.

As to the fourth factor, the defendant's presence at the scene of the killing and ability to facilitate or prevent the victim's death, Taylor reiterates his claim that there was no evidence he knew Rawlings was in the trunk. Therefore, he argues, "the evidence does not prove beyond a reasonable doubt that appellant had an opportunity to stop it and failed to do so." As noted above, Taylor may not relitigate his involvement in the kidnapping. The trial court found, and substantial evidence supports, that Taylor "engaged in significant execution of the underlying criminal enterprise while being present at all stages," and "did nothing to interrupt the chain of events" or "minimize the risk of violence." Taylor targeted Rawlings, pushed or punched him into submission alongside the co-perpetrator, and placed Rawlings in the trunk rather than, say, allowing him to ride in the passenger compartment or simply leaving him in the garage. This factor accordingly favors a finding that Taylor was a major participant.

The final *Banks* factor is what the defendant did after lethal force was used. Here, substantial evidence supports the trial court's findings that Taylor fled the crash scene with items looted from the home without even a cursory attempt to check on Rawlings and proceeded to violently carjack another victim. This conduct does not reflect disapproval or disavowal of the killer's actions. Instead, as the trial court found, it "demonstrates an ongoing lack of concern for the welfare of others." Taylor's counterfactual claim that he "had no reason to look around the

27

site for Rawlings" because he did not know Rawlings had been in the trunk does not convince us otherwise.

Substantial evidence supports the trial court's findings regarding the *Banks* factors, both individually and collectively. We find no error in the court's conclusion that Taylor was a major participant in the series of crimes that culminated in Rawlings's death.

## IV.  Reckless Indifference to Human Life

Taylor contends the evidence was also insufficient to prove that he acted with reckless indifference to human life.  We disagree.

At its core, "[r]eckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'"  (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*), quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157 (*Tison*).  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the [appellant] does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)  For instance, a person "who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim" acts with reckless indifference to human life. (*Tison*, *supra*, 481 U.S. at p. 157.)

"Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective

28

element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The California Supreme Court articulated several factors relevant to determining whether a defendant acted with reckless indifference to human life in *Clark*, *supra*, 63 Cal.4th at pp. 618-623. Those factors include: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677, citing *Clark*, *supra*, at pp. 618–623.)

The major participant and reckless indifference factors "significantly overlap" in that "'the greater the defendant's participation in the felony murder, the more likely that he acted

29

with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at pp. 614-615, quoting *Tison*, *supra*, 481 U.S. at p. 153.) Consequently, the trial court's factual finding that Taylor was a major participant in the robbery, burglary, kidnapping, and carjacking leading to Rawlings's death is supportive of the court's additional factual finding that Taylor acted with reckless indifference to human life. (*People v. Cody* (2023) 92 Cal.App.5th 87, 113; see also *Tison*, supra, 481 U.S. at p. 158, fn. 12 [a defendant's status as a major participant in the underlying felony will "often provide significant support for [ ] a [reckless indifference] finding"].)

Taylor argues that the "notion that appellant's specific conduct during the underlying felonies in this case was anywhere close to 'the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery' is irrational." The question is not one of rationality, however, but of substantial evidence. And here, substantial evidence supports the trial court's findings.

The first *Clark* factors concern the defendant's use or knowledge of weapons. Taylor correctly points out that "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 618.) Thus, the trial court's reliance on Taylor's knowledge of the gun in support of this factor was misplaced. However, as discussed above in connection with the similar *Banks* factor, vehicles may be deadly weapons, and Taylor knowingly carjacked Rawlings, put him in the trunk of the Bentley, and used the Bentley to flee the Rawlings home.

The next *Clark* factors concern the defendant's presence at the killing and opportunity to restrain the crime or aid the victim. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps. . . ." (*Clark, supra*, 63 Cal.4th at p. 619.) That is the case here, where Rawlings's death was the result of a tragic sequence of several criminal acts. As discussed above in connection with the overlapping *Banks* factor, substantial evidence supports the trial court's findings that Taylor was present and involved throughout the entire sequence of events, from the planning stages through the fatal crash. We again reject Taylor's claim that he was not present during the kidnapping and reiterate that an appellant cannot relitigate facts necessarily found by the jury or show the evidence is insufficient by "portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera, supra*, 139 Cal.App.4th at p. 1573.)

The next *Clark* factor concerns the duration of the crime. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) Here, the perpetrators subdued Rawlings and ransacked the Rawlings home for 10 to 15 minutes, during which time they also restrained Rawlings in the trunk of the Bentley. Substantial evidence supports the trial court's finding that "Taylor did nothing during [*sic*] to minimize the risk of violence, and instead escalated the risk of violence by putting Rawlings in the trunk." We decline Taylor's invitation to draw the competing inference that he had no opportunity to minimize the risk to Rawlings

31

because he was occupied with burglarizing the home. We agree with him and the trial court, however, that there was no evidence as to the next *Clark* factor, whether Taylor knew his co-perpetrator had a propensity for violence or was likely to use lethal force.

Finally, we consider whether Taylor undertook any efforts to minimize the risk of violence during the felony. The trial court found that he did not, and substantial evidence amply supports this finding. Taylor and his co-perpetrator, armed with duct tape, handcuffs, and a gun, initiated the offenses by ambushing Rawlings as he arrived home from the store. Rather than simply leaving Rawlings at the house as they fled, or placing him in the passenger compartment of the car, Taylor and his co-perpetrator forced him into the trunk. They then led the police on a high-speed chase, knowing full well that Rawlings was rolling around in the trunk as they did so. After crashing the car, both perpetrators fled the scene without checking on or rendering aid to Rawlings, and Taylor proceeded to violently carjack another victim to facilitate his escape. As the trial court astutely noted, "[a] law-abiding person in Taylor's position would have perceived that placing the victim in the trunk of a car that was about to flee the police posed a grave danger to his life, and Taylor knowingly and actively participated in the kidnapping in disregard of that risk." Even though Taylor is correct that there was no evidence Rawlings would have survived had he rendered aid (see *In re Taylor* (2019) 34 Cal.App.5th 543, 559), his actions throughout the course of the entire incident tip this factor against him.

Substantial evidence supports the trial court's findings regarding the *Clark* factors, both individually and collectively. We accordingly affirm its finding that Taylor acted with reckless

indifference to human life during the events that led to Rawlings's death.

**V.    Youth**

Taylor, who was 23 years old at the time of Rawlings's death, contends that the order denying his petition must be vacated and the matter remanded for the trial court to consider the impact of his youth on his conduct and mental state. He asserts that his "youth likely impacted his ability to appreciate the risks," and thus was a relevant factor that the trial court should have considered. Taylor concedes that he failed to raise the issue in his briefing or at the hearing, but argues this omission "should be excused because of the recency" of *People v. Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7 (*Jones*), which stated that "a defendant's youthful age must be considered."

A review of *Jones* shows why remand is not warranted in this case. There, defense counsel argued the defendant "'was barely 20 years old at the time of [the] crime,'" "'immature'" and "'still developing.'" (*Jones*, *supra*, 86 Cal.App.5th at p. 1091.) The trial court issued a detailed explanation of its denial of the resentencing motion, but "did not mention [the defendant's] age or maturity level." (*Ibid.*) On appeal, the court observed that "[i]n the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Id.* at p. 1092.) Rather, the court will "presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*Ibid.*) The court determined, however, the "unusual circumstances" of the case before it required remand "for the court's consideration of all relevant factors consistent with prevailing law." (*Id.* at pp. 1079, 1093.)

33

The *Jones* court pointed out that *In re Moore* (2021) 68 Cal.App.5th 434, which "squarely" held a defendant's youth is a relevant factor in the *Banks* and *Clark* analyses, was not issued until months after the trial court's decision denying Jones' resentencing motion. (*Jones*, *supra*, 86 Cal.App.5th at p. 1092.) To the extent another case, *People v. Harris* (2021) 60 Cal.App.5th 939 (*Harris*) previously indicated youth was a relevant factor, that opinion was issued "just a few weeks" before the trial court's denial of Jones' resentencing petition and without any "remonstrance by defense counsel." (*Jones*, *supra*, at pp. 1091-1092.) Accordingly, and "in the interest of justice," the court remanded the matter for "the trial court to have a meaningful opportunity to consider [Jones'] youth . . . consistent with prevailing law." (*Id.* at p. 1093.)

Here, the "unusual circumstances" identified in *Jones* are not present. Taylor's evidentiary hearing was held on July 24, 2023, more than six months after *Jones*, 23 months after *Moore*, and 29 months after *Harris*. Taylor's hearing also significantly post-dated other relevant case law cited in *Jones*. (See *Jones*, *supra*, 86 Cal.App.5th at pp. 1091-1092; citing *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991 [no substantial evidence defendant acted with reckless indifference in light of his youth] and *Harper, supra,* 76 Cal.App.5th at pp. 467-472 [habeas corpus petition denied where defendant's youth, even if a factor, did not change his culpability].)

Although neither Taylor nor the prosecution expressly addressed his youth as a relevant factor, "we presume the trial court followed the law in exercising its duties and duly considered the evidence presented to it." (*Jones*, *supra*, 86 Cal.App.5th at p. 1092.) This presumption derives from the "fundamental principle

34

of appellate procedure," that "a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) "In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Jones*, *supra*, 86 Cal.App.5th at p. 1092.)

Here, information regarding Taylor's age was included in the underlying criminal record admitted at the evidentiary hearing. His birthdate was included on the charging documents, and several witnesses at the trial commented on Taylor's "youthful appearance" and estimated that both perpetrators were "young." The trial court expressly stated that it reviewed the entire record of conviction, including the lengthy trial transcript and exhibits. Although the court did not expressly discuss Taylor's age in issuing its final ruling on the petition, it was not required to do so, and there is no affirmative indication it refused to consider the point. We thus presume the court properly considered Taylor's youth as part of its analysis. Taylor's speculation to the contrary does not defeat that presumption.

In any event, youth alone is not dispositive (*Harper*, *supra,* 76 Cal.App.5th at p. 470), and "[t]he fact of youth cannot overwhelm all other factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.) Here, the trial court performed a thorough inquiry, and its findings were well supported by substantial evidence. Taylor has not demonstrated which factors or findings, if any, were affected by the key traits of youth, impulsivity and vulnerability to peer pressure, which

"presumably . . . weaken[ ] as a defendant approaches 26." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) As respondent points out, the evidence showed that the crimes were planned and Taylor was prepared with a disguise, restraints, and a police scanner. Nothing in the record suggested that Taylor acted in response to peer pressure from the co-perpetrator or anyone else. For all these reasons, we find that remand for the consideration of Taylor's youth is not warranted.

## DISPOSITION

The order denying Taylor's petition for resentencing under section 1172.6 is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P. J.

ZUKIN, J.